UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHAN-LI PRAYITNO, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 4310 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| NEXTEP FUNDING LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In this putative class action, plaintiff Chan-Li Prayitno claims that, in offering him a loan to defray car repair expenses, defendant Nextep Funding LLC ("Nextep") failed to disclose the loan's true credit terms at an exorbitant rate of interest, violating the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, the Illinois Consumer Installment Loan Act ("CILA"), 205 ILCS 670/20(d), and the Illinois Interest Act, 815 ILCS 205/4. Defendant has disclosed an expert witness, whose testimony it seeks to offer on the range of other credit options that would have been available to plaintiff. Plaintiff has moved to exclude the expert's testimony as inadmissible under the Federal Rules of Evidence and the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). For the following reasons, the Court denies the motion.

## BACKGROUND

In February 2017, plaintiff's auto transmission failed. He had his vehicle towed to Atomic Transmission, where he learned that he could have his transmission either rebuilt, at a cost of $2,105, or replaced with a used transmission, at a cost of $995. Plaintiff could not afford the rebuilt transmission, but he believed he could raise enough to pay for a used transmission.

According to the owner of Atomic Transmission, however, a rebuilt transmission is more reliable than a used transmission, and plaintiff learned that Atomic Transmission could arrange an extension of credit to finance the repair.

Atomic Transmission presented plaintiff with a document, captioned as a "Merchandise/Service/Repair Contract" ("MSR contract") under the Nextep logo. On page 2, the document warned that "[b]y signing . . . you are entering into a Closed End Consumer Product Lease," and it described the payment structure as follows: "To satisfy your lease obligation and purchase and own your property you must make one in-store payment of 340.00 and 17 lease payments of 245.58, plus a final residual payment of 201.06." (*Id.* at 3.) Thus, the MSR contract required plaintiff to pay a total of $4,715.92, $2,610.92 more than the repair cost of $2,105.

Although it disclosed this sequence of installment payments, the MSR contract did not disclose the annual percentage rate ("APR"), which, according to plaintiff, defendant was required to disclose under TILA. Plaintiff alleges that he entered into the MSR contract without understanding how much he would pay in interest. According to plaintiff, the MSR contract documents were misleading as presented to him, and, if he had known that the contract required him to pay an APR in excess of 140%, he would have either purchased the cheaper used transmission or tried to arrange for a cheaper loan elsewhere, as he would not have knowingly paid an APR at or above 140%. Plaintiff alleges that he attempted to pay off the loan early, but Nextep quoted him a higher payoff amount than he expected, and he could not determine from the documents whether the quoted amount was correct. Additionally, plaintiff claims that the cost of the credit was in excess of the limits imposed by the Illinois Interest Act.

Defendant has retained Eric Forster to provide expert opinion testimony on the range of financing options that would have been available to plaintiff. Mr. Forster has worked for over

thirty years in the "real estate finance industry as a mortgage originator and underwiter." (Def.'s Resp. Br. Ex. C, Decl. of Eric Forster, ¶ 7.) He holds a master's of business administration degree and a certificate in financial forensics, and he regularly provides expert testimony in matters concerning standards and practices in mortgage lending, including matters concerning alleged TILA violations. He acknowledges that he has "spent [his] career primarily as a real estate lender," but he has fielded "many requests over the years for alternative and unsecured loans," which he has typically referred to lenders who specialize in the appropriate field. (*Id.* ¶ 9.)

According to his expert report, Mr. Forster proposes to testify that, under general principles of loan underwriting, lenders typically consider three factors in making credit decisions: the applicant's credit rating; his income; and the value of any collateral. Mr. Forster opines that prospective lenders would have viewed plaintiff as a significant credit risk based on his weak credit rating and relatively low provable income, particularly to the extent he might have sought credit without pledging any collateral or by pledging only his car. As a result, Mr. Forster opines, plaintiff likely would not have been able to obtain the credit necessary to repair his car from any other lender, and even if he could have, the APR would have been higher than 140%.

According to Mr. Forster, a consumer in plaintiff's position generally would have three basic credit options: (1) an auto title loan, (2) a payday loan, and (3) a small consumer loan. Auto title loans are tied to the appraised value of the car, and considering that, after subtracting the value of the repair, plaintiff's car was only worth about $300, an auto title loan would not have been a viable option for him; even if plaintiff could have been approved for one, it would have been at a very high APR, above 140%. Similarly, any payday loan plaintiff might have been able to obtain would have been at a high APR. In fact, based on Mr. Forster's research into Illinois payday lending, it would have been above 300%, far higher than the 140% plaintiff was required to pay

3

under the MSR contract. As for small consumer loans, Mr. Forster searched for Illinois lenders licensed under CILA, but he found that "the majority of these lenders do not publicly disclose their underwriting criteria." (*Id.* ¶ 52.) However, Mr. Forster found two examples of such lenders that did disclose at least some underwriting criteria, and plaintiff would not have qualified for a loan from either: the first, Illinois Lending, required an income of at least $300 per week and the other, "Total Loan Company," required a minimum income of at least $1,500 per month—but plaintiff made only about $1,000 per month. Mr. Forster concluded that, given plaintiff's low income and credit rating, the other lenders were also unlikely to offer plaintiff credit, in the absence of any valuable collateral.

## ANALYSIS

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999) (extending application of *Daubert* standard to non-scientific experts). Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule imposes "three basic prerequisites." *Weinstein's Federal Evidence* § 702.02[3]. "Under Federal Rule of Evidence 702 and *Daubert,* the district court must . . . determine [1] whether the witness is qualified; [2] whether the expert's methodology is . . . reliable; and [3] whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"

4

*Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007)).

"'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990)). This is a liberal standard; the expert need only have some "specialized knowledge that would assist the trier of fact." *Wilson v. City of Chi.*, 6 F.3d 1233, 1238 (7th Cir. 1993); *see United States v. Williams*, 81 F.3d 1434, 1441 (7th Cir. 1996) ("All you need to be an expert witness is a body of specialized knowledge that can be helpful to the jury. . . . You don't need to be a scientist or use the methodology of science."). "The question is not whether [the proffered expert] witness is more qualified than other experts in the field; . . . [r]ather, the issue is whether the witness is more competent to draw the inference than the lay jurors and judge." 1 *McCormick on Evid.* § 13 (7th Ed.). "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

An expert opinion may be based on "extensive and specialized experience," rather than scientific data, if the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152-53; *see also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience, training, or education.*'"). In such cases, "the test for reliability . . . is 'flexible.'" *United States v.*

5

*Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (quoting *Kumho Tire*, 526 U.S. at 141). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment," not on a motion to bar the expert from testifying on evidentiary grounds. *Smith*, 215 F.3d at 718. "The proponent of the expert"—here, defendant— "bears the burden of demonstrating that the expert's testimony" is admissible under the *Daubert* standard and the Federal Rules of Evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)

Plaintiff argues that Mr. Forster is not qualified to give the opinions he has disclosed because they are purportedly based on his professional experience, which is in mortgage lending, not the smaller consumer loans that are the subject of his proposed testimony. Further, Mr. Forster's professional experience has been in California, not Illinois, and according to plaintiff, he showed in his deposition testimony that he lacks knowledge of the Illinois consumer lending landscape. Defendant responds that Mr. Forster has decades of experience in lending and loan underwriting, and plaintiff's objections concerning the soundness of his conclusions based on the nature of his experience go to the weight of his proposed testimony, rather than its admissibility.

Both parties argue that *Gayton v. McCoy*, 593 F.3d at 616-18, supports their position. In *Gayton*, the district court ruled that the plaintiff's expert witness's opinions on the factors that may have contributed to the decedent's congestive heart failure, including her treaters' failure to (1) treat her vomiting symptoms or (2) provide her with heart medication drugs, were inadmissible, in part because the expert was not qualified. The Seventh Circuit reversed the exclusion of the expert's testimony as to the former factor, reasoning that, although he was a general practitioner, not a subspecialist in a relevant field such as cardiology or pharmacology, the expert was

6

nevertheless qualified to opine on whether the decedent's "vomiting combined with her diuretic medications may have contributed to her tachycardia and subsequent death." *Id.* at 618. The court explained that "[t]he effects of vomiting on potassium and electrolyte levels in the body is not [sub-]specialized knowledge held only by cardiologists"; rather, it is "knowledge that any competent physician would typically possess." *Id.* As to the heart medication drugs, however, the Seventh Circuit affirmed the exclusion of the expert's testimony, explaining that the expert was not a cardiologist or pharmacologist and did not claim to have "any specific knowledge regarding how these drugs function, whether they are efficacious in the short term or the long term, or how they prevent [congestive heart failure] from reaching a critical stage." *Id.* at 617. Without "specialized cardiac or pharmacological knowledge upon which to base his conclusion that these drugs had a reasonable probability of saving [the decedent's] life if taken in the days before her death," the expert was not qualified to render an opinion on the matter. *Id.* at 618.

The Seventh Circuit reached these differing conclusions by asking "not whether [the] expert witness [was] qualified in general, but whether his 'qualifications provide[d] a foundation for [him] to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994)). To illustrate the principle, in a case the Seventh Circuit relied on in *Gayton*, the Sixth Circuit offered the following hypotheticals:

> [I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

7

*Berry*, 25 F.3d at 1349-50.

The Court agrees with defendant that Mr. Forster's opinion is more like the *Gayton* expert's opinion on vomiting than his opinion on heart medication. Mr. Forster proposes to testify that (1) based on his decades of professional experience, he knows that the three factors relevant to an underwriting decision are credit, income, and collateral; and (2) given plaintiff's low credit rating, low income level, and lack of valuable collateral, and based on Mr. Forster's experience and his research into Illinois payday lenders and small consumer lenders, plaintiff was unlikely to find credit on better terms than defendant provided. Thus, like the general practitioner in *Gayton* and the aeronautical engineer in *Berry*, Mr. Forster proposes essentially to give his opinion as to how a general principle (the credit/income/collateral formula) applies in this particular case (*see, e.g.,* Pl.'s Mem. App. B, Forster Dep. at 23:25-24:2, ECF No. 134 at 15), and his familiarity with that general principle, based on his professional experience, qualifies him to give an opinion that will assist the trier of fact.

This is so notwithstanding the fact that Mr. Forster is not an expert on all the factual issues that touch on the subject matter of his opinion and that will be relevant to the trier of fact's ultimate conclusion. The general practitioner in *Gayton* was qualified to opine on whether the failure to treat vomiting could have contributed to the decedent's death of congestive heart failure based on his general knowledge of medicine; he did not have to be an expert on congestive heart failure or on heart medication. The aeronautical engineer in the *Berry* hypothetical was qualified to explain how a bumblebee is able to fly based on his general knowledge of "flight principles"; he did not have to be an expert on bumblebees. Similarly, Mr. Forster can opine on how plaintiff's credit rating, income level, and (lack of) valuable collateral would have affected his range of credit options based on Mr. Forster's general knowledge of underwriting and experience

in that field; he does not have to be an expert on Illinois lending or on small consumer loans to do so. Neither Rule 702 nor *Daubert* requires an expert to be the *most* qualified person to opine on the issue based on the narrowest, *most* specialized expertise; he need only have "a body of specialized knowledge that can be helpful to the jury." *Williams*, 81 F.3d at 1441; *see Banister v. Burton*, 636 F.3d 828, 832 (7th Cir. 2011) (expert witness could apply his "knowledge of anatomy, gained through his experience as a trauma surgeon and as a student of medicine, to determine that the gunshot injuries would not have prevented Banister from using his arm to throw an object, or from crawling"). Mr. Forster meets that standard.

In *Gayton*, the expert's opinion on the heart medication's effects was inadmissible because the expert could give "no basis for his opinion that if prison officials had obtained and administered these medicines to [the decedent] during the two days prior to her death she would have survived," which showed that he lacked the specialized knowledge required to opine on the matter. 593 F.3d at 617-18. But in this case, Mr. Forster does not lack specialized knowledge bearing on the subject of his testimony; he has long professional experience in underwriting, which has taught him that credit decisions are made based on credit rating, income, and collateral, and his application of that experience to plaintiff's case leads him to opine that, based on his poor credit rating, low income, and lack of valuable collateral, plaintiff's credit options would have been limited. Thus, *Gayton* is distinguishable with respect to the heart medication opinion.

It is clear that Mr. Forster possesses certain specialized knowledge that may assist the trier of fact, and to the extent that plaintiff argues that it is not narrowly specialized enough in the relevant field to point to the correct conclusion, the way to test his expertise is not at the threshold in a *Daubert* motion, but at trial though opposing evidence or cross-examination. *See Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not supplant the adversarial process; shaky

9

expert testimony may be admissible, assailable by its opponents through cross-examination.") (internal quotation marks omitted); *see also id.* ("[C]ourts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats.") (citing cases); 3 *New Wigmore: A Treatise on Evidence* § 3.2 (2d ed.) ("When generally accepted formulas are available, . . . credentials in a statistical subject area should not be necessary. After all, the [opposing side] can produce a statistically trained specialist to counter testimony that turns out to be too simple-minded."). Plaintiff is free to attempt to demonstrate at trial, by cross-examining Mr. Forster or introducing his own expert or other contrary evidence, that Mr. Forster's conclusions are wrong or untrustworthy because he lacks familiarity with the underwriting criteria of relevant Illinois lenders or small consumer lenders like them. It is that sort of attack, rather than a *Daubert* motion, that is the proper way to challenge the "soundness of the factual underpinnings" of an expert's analysis or the "correctness of [his] conclusions." *See Smith*, 215 F.3d at 718. The potential "shak[iness]" of Mr. Forster's testimony does not make it inadmissible.

In their briefs, the parties discuss numerous district court decisions, most of which are either dissimilar or unpersuasive, but one is both analogous and persuasive. In *Ill. Liberty PAC v. Madigan*, No. 12 C 5811, 2015 WL 5589630, at *4-5 (N.D. Ill. Sep. 21, 2015), the plaintiff's expert, a political scientist who worked as a consultant and lobbyist, proposed to testify that the structure of Illinois's campaign finance system created an undue risk of political corruption, based on "his experience," a "literature review," and some examples of two legislative caucus committees' expenditures from the 2012 election cycle. The court explained that the expert's analysis was "qualitative; his inclusion of some contributions as examples [did] not transform the fundamental character of his analysis, and he [did] not purport to have conducted a comprehensive

10

quantitative or statistical analysis." *Id.* at *4.[1] The defendant argued that the expert was not sufficiently familiar with Illinois politics, but the court found that his "education and experience give him the foundation necessary to opine about the incentives and power structure inherent in any American campaign financing scheme." *Id.* at *5. The expert used a skill "essential to [his] professional activities," the "ability to identify opportunities and incentives in the structure of a campaign finance law," to perform his analysis, and "[t]he distinctions (if any) between the campaign finance systems of Illinois and the other States impact the weight, not the admissibility, of Osborn's opinions." *Id.*

This case is similar. In the course of his long career in lending and underwriting, Mr. Forster learned to analyze whether to extend credit by weighing an applicant's credit rating, his income level, and the value of any collateral. He used this analytical method to assess plaintiff's likelihood of obtaining credit, as informed by his research on the types of loans available to Illinois borrowers in plaintiff's position, and he concluded that plaintiff was unlikely to have been able to obtain credit on terms more favorable than those defendant offered him. To the extent there are any "distinctions," between the underwriting criteria of any relevant Illinois lenders and those of other states or those who specialize in mortgage lending (the kind Mr. Forster is most familiar with), those distinctions "impact the weight, not the admissibility," of Mr. Forster's opinions. *Illinois Liberty PAC*, 2015 WL 5589630, at *5.

---

[1] Plaintiff argues that this case is different from *Illinois Liberty PAC* because Mr. Forster performed a quantitative, not qualitative, analysis, but the Court disagrees. Mr. Forster did not, for example, attempt to perform a statistical study of credit decisions made by Illinois lenders to determine the terms of any credit plaintiff might have been able to obtain. As in *Illinois Liberty PAC*, he "does not purport to have conducted a comprehensive quantitative or statistical analysis." 2015 WL 5589630, at *4. Instead, he performs a qualitative analysis based on his experience, just like the expert in *Illinois Liberty PAC*. Therefore, the district court decisions the parties discuss concerning quantitative statistical or scientific expert analyses are of limited usefulness here.

11

Mr. Forster is qualified to opine on plaintiff's likelihood of obtaining better credit terms by his long experience in lending and underwriting. He described a reliable methodology that lenders would have used to assess plaintiff's creditworthiness, and he reliably applied it to this case to form his opinion. Because that opinion will assist the trier of fact's determination of whether and how plaintiff was injured by defendant's credit terms, it is admissible under *Daubert* and the Federal Rules of Evidence.

## CONCLUSION

For the reasons set forth above, plaintiff's motion [133] to bar Eric Forster from testifying as an expert witness is denied. A status hearing is set for December 18, 2019.

**SO ORDERED.**                                    **ENTERED: December 3, 2019**

**HON. JORGE ALONSO**
**United States District Judge**