## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHAN-LI PRAYITNO, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 4310 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| NEXTEP FUNDING LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chan-Li Prayitno claims that, in offering plaintiff financing for a new auto transmission, defendant Nextep Funding LLC ("Nextep") obscured the true cost of the financing, violating the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*., the Illinois Consumer Installment Loan Act ("CILA"), 205 ILCS 670/20(d), and the Illinois Interest Act, 815 ILCS 205/4 ("Interest Act"). Defendant moves for summary judgment. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

In February 2017, plaintiff's auto transmission failed. During that time, plaintiff lived with his parents in Romeoville, Illinois, while pursuing a degree in computer networking at Joliet Junior College, where he attended classes at either of two campuses four to five days per week. Plaintiff also worked approximately twenty to thirty hours per week at a nearby Chinese restaurant, China House II. At the restaurant, plaintiff's duties included customer service, answering phones, taking orders, and delivering food. He owned a 2002 Acura TL 3.2, which he used both for personal purposes and to make food deliveries for China House II during working hours. It is unclear, and

the parties dispute, how much time plaintiff spent in his car delivering food; it was at least fifty percent of his working hours, but not one hundred percent, as plaintiff sometimes worked one or more days per week inside the store. (*See* Def.'s LR 56.1 Resp. ¶ 9, ECF No. 166; Def.'s LR 56.1 Stmt. Ex. A, Pl.'s Dep. at 54:14-23, ECF No. 154-1.)

Upon discovering the transmission problem, plaintiff had his vehicle towed to Atomic Transmission ("Atomic"), where he learned that his transmission would need to be rebuilt or replaced. Plaintiff asked for the lowest-cost solution. The parties dispute what price he was quoted and whether it represented a quote for the total cost including both parts and labor, but the figure was at least $1,200, and it is undisputed that whatever the precise quote was, plaintiff responded that he could not pay that amount at that time. Plaintiff was then informed that he could apply for financing via defendant.

On February 21, 2017, plaintiff entered into a contract with defendant. Plaintiff signed a written contract form, captioned as a "Merchandise/Service/Repair Contract" ("MSR Contract") under the Nextep logo. On page 2, the document stated that "[b]y signing . . . you are entering into a Closed End Consumer Product Lease" of "property" with a "total value" of "$2010.58," and it described the payment structure as follows: "To satisfy your lease obligation and purchase and own your property you must make one in-store payment of <u>340.00</u> and <u>17</u> lease payments of <u>245.58</u>, plus a final residual payment of <u>201.06</u>." (Pl.'s Stmt. of Add'l Facts Ex. 2, Cook Dep. Ex. 2 App. B, MSR Contract, ECF No. 158 at 87.) On page 3, the MSR Contract stated, "This document governs your Lease. . . . The "Property" is the product(s) described below that you are leasing from us . . . . You are leasing the Property and have no ownership rights in it unless you exercise your purchase option. . . . IF YOU DO NOT MEET YOUR OBLIGATIONS UNDER THIS LEASE, WE MAY RETAKE YOUR PROPERTY." (*Id.* at 3, ECF No. 158 at 88.) The

MSR Contract then described the leased "property" as a "Transmission Repair" in the "Agreed Upon Value" of "$2,105.00." (*Id.*, ECF No. 158 at 88; *see also* Compl. App. A, ECF No. 1-1 at 3.)  It set forth the same schedule of payments described above and explained, "You have an option to purchase the Property at the end of the Lease term for $201.06." (MSR Contract at 3.)  Thus, the MSR Contract required plaintiff to pay a total of $4,715.92, significantly more than double either the amount of the "Agreed Upon Value" of the "Transmission Repair" or the resulting "total value of the property."

Defendant's Retailer/Service Agreement, an agreement it makes with all of its retail dealers, including Atomic, provides that "'Nextep will pay Retailer . . . the purchase price of the subject merchandise, minus . . . the amount of the first lease payment retained by Retailer, and . . . [a] Merchant Discount Rate [of] 5%." (Pl.'s Stmt. of Add'l Facts Ex. 2, Cook Dep. Ex. 3, Retailer/Service Agreement, ECF No. 158 at 101; *see* Def.'s LR 56.1 Resp. ¶ 27, ECF No. 166.) On February 23, 2017, two days after plaintiff entered into the MSR Contract, defendant paid Atomic the balance due for plaintiff's rebuilt transmission under this agreement, S1,664.47.

Although the MSR Contract disclosed the sequence of installment payments, it did not disclose the annual percentage rate ("APR"), which was over 140%. Plaintiff alleges that the MSR Contract documents were therefore misleading as presented to him, and he entered into the contract without understanding how much he would pay in finance charges.

Plaintiff did not shop around for other credit before entering into the MSR contract.  His credit cards were near their limits at the time, and, according to Eric Forster, defendant's expert, plaintiff's credit rating, limited income, and lack of valuable collateral, would have left him with no viable options for securing other credit.  Plaintiff disputes this, stating that he would not have knowingly paid over 140%; he would have gone "anywhere else that would give [him], like, a

3

lower interest rate." (Prayitno Dep. at 111:22-23.)  Even if he couldn't find cheaper credit elsewhere, plaintiff states that he would not have entered into the MSR Contract if he had known its true cost.  Instead, he would have either delayed the transmission work until he could save up the necessary cash, doing on-site work at the restaurant or borrowing his mother's car to make deliveries in the interim, or else he would have borrowed cash from a family member or friend.

Plaintiff believed that he could enter into the MSR Contract to get the transmission repair completed and then pay off the balance early.  When he contacted defendant to inquire about the payoff amount, a Nextep representative pressured him to make the monthly payments rather than pay off the balance in advance, telling him that it would improve his credit.  Plaintiff was alarmed when he was quoted a payoff figure of over $2,000; he believed that the correct payoff amount should have been much less than that, particularly given that he had already paid $340 in the store.

Plaintiff made one payment to defendant of $245 in the spring of 2017. Facing financial problems and considering bankruptcy, plaintiff then consulted counsel.  He filed this putative class action lawsuit in June 2017.

In the operative Third Amended Complaint, plaintiff claims that (1) the MSR Contract that defendant offered to him and others similarly situated was a loan that defendant disguised as a "lease" in an attempt to circumvent and violate TILA's disclosure requirements, including its requirement that lenders must disclose the APR, *see* 15 U.S.C. § 1638; (2) defendant charged exorbitant, usurious interest in excess of the rates allowable under the Interest Act and CILA; and (3) defendant's conduct was deceptive and unfair under the ICFA because it disguised the true terms of credit and charged exorbitant interest.

## ANALYSIS

"The Court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

Defendant moves for summary judgment on all three counts of plaintiff's Third Amended Complaint. First, defendant argues that it is entitled to summary judgment on the TILA claim (Count I) because plaintiff lacks standing—and even if plaintiff has standing, defendant argues, he lacks evidence that the February 2017 transaction was primarily for personal, family, or household purposes. Second, defendant argues that it is entitled to summary judgment on the Interest Act/CILA claim (Count II) because the MSR Contract was for a lease, not a loan of money. Third, defendant argues that it is entitled to summary judgment on the ICFA claim (Count III) because plaintiff lacks evidence of actual damages.

## I. TRUTH IN LENDING ACT

Defendant argues that plaintiff lacks standing to assert his TILA claim because, even if

defendant may have committed some error or omission that technically violated TILA, plaintiff has not shown how it harmed him or risked harming him by affecting his consumer behavior. Additionally, defendant argues that the transaction was not for personal, family, or household purposes because plaintiff needed his car for work.

### A. Standing

The Court previously set forth the legal principles governing whether a plaintiff has standing as follows:

> The jurisdiction of federal courts is limited to "cases" and "controversies" as described in Article III, Section 2 of the Constitution. "There is no case or controversy if the plaintiff lacks standing to challenge the defendant's alleged misconduct." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 587 (7th Cir. 2016). To establish Article III standing, "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. [1540, 1547 (2016)] (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The plaintiff has the burden of establishing these elements "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. . . .
>
> *Spokeo* instructs that "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S.Ct at 1548 (quoting with alteration *Lujan*, 504 U.S. at 560). "A 'concrete' injury must be '*de* facto'; that is, it must actually exist." *Spokeo*, 136 S.Ct at 1548. "'Concrete'" is not, however, necessarily synonymous with 'tangible.'" *Id.* at 1549. "Although tangible injuries are perhaps easier to recognize, intangible injuries can nevertheless be concrete." *Id.* In determining whether an intangible harm constitutes a sufficiently concrete injury, "both history and the judgment of Congress play important roles." *Id.*

(Jun. 27, 2018 Order, ECF No. 77 (citing *Abante Rooter & Plumbing, Inc. v. Oh Ins. Agency*, No. 15-cv-9025, 2018 WL 993883, at *1-2 (N.D. Ill. Feb. 20, 2018)). Under these principles, "a plaintiff must do more than point to a bare procedural violation; he must show that the violation harmed or 'presented an appreciable risk of harm to the underlying concrete interest that Congress sought to protect by enacting the statute.'" *Lavallee v. Med-1 Sols., LLC*, 932 F.3d 1049, 1052–53

(7th Cir. 2019) (quoting *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 887 (7th Cir. 2017)).

Defendant argues that plaintiff lacks standing because he lacks evidence that plaintiff had any other options for repairing his car, so, even if defendant failed to adhere to TILA's disclosure requirements, he cannot have been harmed because it cannot have affected his consumer behavior. Plaintiff alleges in his complaint that he could have purchased a used transmission at a lower price than the rebuilt transmission he financed with defendant, but he admitted in discovery that he lacked the cash for even that lower-cost repair. He did not shop around for lower-cost repairs or financing, and defendant not only argues that there is no evidence that he could have gotten a better deal elsewhere, but also presents (disputed) evidence that he very likely could not have, given his credit score, limited income, and lack of valuable collateral. And defendant argues that plaintiff could not explain at his deposition how, even if the APR had been disclosed to him, he would have used it to calculate the payoff amount or it otherwise would have affected his behavior.

In addition to disputing defendant's evidence concerning plaintiff's credit options, plaintiff responds that whether he had other credit options makes no difference because, regardless of whether he could have found a better deal elsewhere, plaintiff would not have entered into the MSR Contract if defendant had disclosed the APR, even if that meant declining to repair his car right away. At his deposition, plaintiff testified that he could have saved up to fix his car by working inside the restaurant and borrowing his mom's car to make deliveries, or he could have borrowed from family members; in fact, he subsequently obtained another car with the assistance of his parents.

Rather than opposing this response on its own terms, defendant cries foul, replying that this argument is inconsistent with the allegations of the complaint. As defendant recounts, this Court previously dismissed an earlier version of plaintiff's complaint because it made no

allegations that "the alleged failure to provide . . . information (like APR) changed [plaintiff's] behavior," *i.e.*, that he would have "evaluated the loan differently, made a different choice, or behaved differently in any way, had the APR been disclosed." (Jun. 27, 2018 Order at 3.) Plaintiff subsequently amended his complaint to allege that, had he known he would have to pay an APR of over 140%, he would have either purchased a cheaper used transmission or sought a loan elsewhere, and he was "unwilling to pay more than 40-50% interest." (3d Am. Compl. ¶¶ 28-29.) Based on the addition of these allegations, the Court denied defendant's subsequent motion to dismiss. According to defendant, plaintiff cannot be heard now to predicate standing for his TILA claim on a different factual allegation, citing *Abuelyaman v. Illinois State University*, 667 F.3d 800, 814 (7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion.") (citing *Andree v. Ashland County,* 818 F.2d 1306, 1314 n. 11 (7th Cir. 1987)). *See also Colbert v. City of Chi.*, 851 F.3d 649, 656 (7th Cir. 2017) (citing *Abuelyaman*).

"When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (citing *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808-09 (7th Cir. 2014)). "[I]t is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker*, 772 F.3d at 808. Complaints plead *grievances*, not legal theories," and a plaintiff's complaint need only "spell[] out his grievance." *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020). Because a plaintiff need not plead legal theories, it follows that generally he "can later alter those theories" at summary judgment, absent any unfair or unreasonable surprise, delay, or difficulty posed to the defendant. *Chessie*, 867 F.3d at 859-60 (citing *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir.

8

1996)).  However, "[a]n attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint," and "the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims."  *Chessie*, 867 F.3d at 859-60.

The Seventh Circuit explained in *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529, 540-41 (7th Cir. 2018), that the outcomes in *Chessie* and *Whitaker* illustrate the distinction between a permissible change in the complaint's theory and an impermissible alteration of its factual basis:

> In *Whitaker*, we accepted the plaintiff's switch from her original theory of an "agency" relationship (between the defendant and a third party) to her revised theory of a "joint employer" relationship. *Whitaker*, 772 F.3d at 807. We explained that this change did not alter the "fundamental factual allegation" in the complaint; the plaintiff merely had "offered an alternative legal characterization of the factual relationship." *Id.* at 808-09. By contrast, in *Chessie*, we rejected the plaintiff's alteration of his original theory because it necessarily altered the fundamental factual allegations in his complaint. *Chessie*, 867 F.3d at 860-61. There, the plaintiff originally presented a case based on common law negligence but, on summary judgment, switched it to a negligence per se case. We rejected this revision because proceeding as a negligence per se case required the fundamental factual allegation that the plaintiff was injured by the defendant's *removal* of dirt from near the plaintiff's property, whereas the original theory had rested on the allegation that his injury arose from the defendant's *dumping* of dirt on the plaintiff's property. *Id.* at 861. The facts needed to support his new legal theory were inconsistent with his original factual allegations.

Under these "firm principles,' the court in *BRC* explained, a court's task is to determine whether the non-moving party's changed position "alters the factual basis of its complaint or only the legal theory upon which [it] wishes to recover" by "determin[ing] whether [its] original factual allegations state a plausible claim to relief" under the new theory. *Id.* If so, then the court must "examine the consequences of allowing [the non-moving party] to proceed under this new theory, with an eye toward unreasonable delay of the case and difficulties posed" to the moving party.  *Id.*

This case is unlike *Chessie* and more like *Whitaker* because plaintiff's statement that he would not have entered into the MSR Contract if he had known the true APR, regardless of whether

he could have found cheaper credit or cheaper repairs elsewhere, does not alter the factual basis of his complaint. In arguing otherwise, defendant focuses on paragraph 28 of the Third Amended Complaint, in which plaintiff alleges that, had the APR been disclosed, he would have either purchased a cheaper transmission or sought a cheaper loan elsewhere. But defendant ignores paragraph 29, in which plaintiff alleges that he was "unwilling to pay more than 40-50% interest." Plaintiff's testimony at his deposition was not inconsistent with these allegations: he testified essentially that he would have tried to find a cheaper alternative to the MSR Contract, but failing that, he would have declined to repair his car's transmission at all, rather than enter into the MSR Contract. This is sufficient to do what the Court required in its earlier ruling—*i.e.*, to show that the failure to disclose the APR "changed [plaintiff's] behavior"—and it does not amount to an improper attempt to add a new claim to the complaint; at most it elaborates on a "factual basis" for the claim that was always in the Third Amended Complaint, and elaborating on the complaint is exactly what plaintiffs are supposed to do in discovery. *See Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("A complaint under Rule 8 limns the claim; details of both fact and law come later, in other documents.").

In this regard, this case is similar to *CMFG Life Insurance Co. v. RBS Securities, Inc.*, 799 F.3d 729, 743-44 (7th Cir. 2015). In *CMFG*, an action for rescission of a securities transaction, the plaintiffs argued for the first time at summary judgment that they purchased securities based on defendant's oral misrepresentations of due diligence, as well as its written misrepresentations of compliance with guidelines. The district court ruled that permitting the plaintiffs to assert the oral misrepresentations as an independent basis for rescission would amount to permitting them inappropriately to add a new claim at summary judgment, but the Seventh Circuit disagreed, explaining that the complaint had always alleged the oral due-diligence representations, and

defendant had deposed plaintiffs' securities trader to inquire about his reliance on them. *Id.* at 743. Thus, the Seventh Circuit reasoned, "[t]he due-diligence representations are not a new claim; they are simply another factual basis for rescission" arising out of the complaint, and plaintiffs were "entitled to refine [their] rescission theory at summary judgment based on evidence produced in discovery," such as deposition testimony. *Id.* at 743-44 (citing *Whitaker*, 772 F.3d at 807-09). Similarly, here, plaintiff is just asserting "another factual basis," rooted in the allegations of the complaint and "refine[d] . . . based on evidence produced in discovery," for finding that he suffered an injury-in-fact. *See CMFG*, 799 F.3d at 743.

Also similar is *BRC Rubber & Plastics*, in which a rubber producer argued initially that its agreement with a seller of carbon black (an ingredient in rubber products) was a requirements contract, which the seller repudiated by failing to satisfy the rubber producer's order, as well as by sending equivocal messages about the satisfaction of future orders. 900 F.3d at 534-35. Following a ruling that the agreement was not a requirements contract, the district court granted summary judgment for the seller, reasoning that the complaint was entirely premised on the theory that the agreement was a requirements contract. *Id.* The Seventh Circuit reversed, reasoning that the equivocal messages were sufficient to support the repudiation claim by themselves, and that it made no difference that the complaint had been drafted to focus on the requirements-contract theory of repudiation because the complaint stated a plausible claim under the equivocal-messages theory, which, unlike in *Chessie*, did not "require a fundamental alteration in [the] factual allegations." *Id.* at 543 n. 36. The same is true here: the complaint states a claim under the theory that plaintiff was "unwilling to pay more than 40-50% interest" to repair his transmission, regardless of whether he had other financing options.

Defendant's best case is *Abuelyaman*, 667 F.3d at 814, but that case is distinguishable for

the same reason the Seventh Circuit distinguished it in *Whitaker*: in *Abuelyaman*, an employment discrimination case, "new and drastic factual allegations of motivation for the discriminating party's action were proffered at the summary judgment stage," when the "plaintiff sought to introduce a new factual basis not previously presented in the pleadings for a claim." *Id.* at 814. On his Title VII retaliation claim, the plaintiff drastically altered his theory of what protected activity the defendant retaliated against him for, and the complaint lacked a sufficient factual predicate for it. Thus, while there may have been a "fundamental alteration" in the allegations in *Abuelyaman*, it provides little support for defendant's argument in this case, where there was less an alteration than an elaboration on an allegation that was in the complaint from the beginning.

Thus, the Court is not persuaded that plaintiffs are making the sort of "new argument," *id.*, that is impermissible at summary judgment. Plaintiff's position is firmly rooted in the complaint and in his deposition testimony, so even if it reflects a change of tack, defendant had fair warning of it, and the change is not the sort of fundamental alteration of the factual basis for the claim that puts the argument out of bounds. *See CMFG*, 799 F.3d at 743-44; *BRC*, 900 F.3d at 543 & n. 36; *Whitaker*, 772 F.3d at 807-09. As in *CMFG*, plaintiff's argument causes no unfair surprise because defendant was put on notice of it at plaintiff's deposition, if not before; nor will it cause defendant any undue delay or unreasonable difficulty.

Apart from this procedural challenge, defendant raises no other argument against plaintiff's standing based on the evidence that he would have not have entered into the MSR Contract if he had known the APR, even if it meant putting off the repair or borrowing from his parents. Therefore, having rejected the argument, the Court need say no more to deny defendant's motion for summary judgment as to the standing issue. Nevertheless, a brief comment on plaintiff's substantive standing argument may be useful, in case the issue comes into play at class certification

or another stage of the case.

In his response brief, plaintiff suggests that "[c]urrent Seventh Circuit law makes clear that [he] has standing," regardless of whether defendant's failure to provide the required disclosures changed his behavior in any way. Plaintiff cites the Seventh Circuit's recent decisions in *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) and *Lavallee*, 932 F.3d at 1053. The Court does not agree that either of these decisions represents any relevant and significant change in the law, as it applies to this case.

In *Gadelhak*, the Seventh Circuit ruled that receiving an unwanted text message in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, without more, "can constitute an injury-in-fact for Article III [standing] purposes" because that claim is analogous to recognized causes of action for "intrusive invasion of privacy." 950 F.3d at 462-63. That conclusion has little bearing on whether receiving an offer of credit that omits certain disclosures required by TILA causes an injury-in-fact. Telling in this regard is *Gadelhak*'s reliance on the Second Circuit's decision in *Melito v. Experian Marketing Solutions, Inc.*, 923 F.3d 85, 93-94 (2d Cir. 2019), another unwanted text message case, which explicitly distinguished *Strubel v. Comenity Bank*, 842 F.3d 181, 194 (2d Cir. 2016), the case on which this Court principally relied in its June 27, 2018 ruling. *Melito* distinguished between a mere "*risk* of harms attendant a statutory violation," such as the omission to make required TILA disclosures in *Strubel*, and "the receipt of unwanted advertisements" via text message, which "*is itself* the harm." 923 F.3d at 93-94. This Court agrees that a receipt of an unwanted text message is critically different from an omission to make required TILA disclosures for standing purposes.

*Lavallee*, a Fair Debt Collection Practices Act ("FDCPA") case, *see* 15 U.S.C. § 1692g, is closer to the facts of this case, but it provides no more support for plaintiff's position. There, the

plaintiff alleged that she had not received certain required disclosures under the FDCPA, and the Court held that she had alleged an injury-in-fact in "significant[]" part because she was "already a defendant in a collection suit brought by [the FDCPA defendant] when the statutory disclosure violation occurred." 932 F.3d at 1053-54. That fact coupled with the "complete deprivation" of the required disclosures, which could have prejudiced her in the collection suit, created an appreciable risk of harm that "len[t] concreteness to her injuries." *Id.* Thus, *Lavallee* is not analogous to this case, and neither it nor *Gadelhak* stands for the proposition that a mere failure to make a statutorily required disclosure is a concrete injury-in-fact by itself.

The Court agrees with defendant that, without evidence that plaintiff would have acted differently if he had received the required TILA disclosures, this case would be more similar to *Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329, 335 (7th Cir. 2019), which rejected the argument that the defendant's incomplete FDCPA disclosure was an injury-in-fact by itself, explaining that the case was of a piece with those in which the Seventh Circuit had held that "procedural injuries under consumer-protection statutes are insufficiently concrete to confer standing" by themselves. *Id.*

Because there are allegations in the complaint and evidence in the record suggesting that plaintiff would not have entered into the MSR Contract if the APR had been disclosed to him, plaintiff has standing to assert his TILA claim.

### B. Personal, Family, or Household Purposes

Plaintiff asserts his TILA claim under 15 U.S.C. § 1638, which explicitly applies only to "consumer credit transaction[s]." TILA defines the term "'consumer,' used with reference to a credit transaction," to "characterize[] the transaction as one in which . . . the money, property, or services which are the subject of the transaction are primarily for personal, family, or household

14

purposes." 15 U.S.C. § 1602(i). Defendant argues that plaintiff entered into the MSR contract not "for personal, family, or household purposes," but for business purposes; namely, so that he could work as a food delivery driver.

To determine whether TILA applies, courts "examine 'the substance rather than the form' of the relevant transactions,'" *Shames-Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994, 1002 (N.D. Ill. 2009) (quoting *Cole v. U.S. Capital, Inc.,* 389 F.3d 719, 727 (7th Cir. 2004)), and "look to the entire surrounding factual circumstances," *Shames-Yeakel*, 677 F. Supp. 2d at 1002 (citing *Tower v. Moss,* 625 F.2d 1161, 1166 n. 4 (5th Cir. 1980) (internal quotation marks omitted)). "The object of a credit transaction generally controls this inquiry, as opposed to the property on which the lender retains a security interest." *Shames-Yeakel*, 677 F. Supp. 2d at 1002 (citing *Sherrill v. Verde Capital Corp.,* 719 F.2d 364, 366–68 (11th Cir.1983) (per curiam)).

Plaintiff responds that (1) his primary occupation in February 2017 was studying computer networking at Joliet Junior College, (2) he worked at China House II only about twenty to thirty hours per week, (3) he did not spend all of his working hours at China House II delivering food, may have spent as few as half of them delivering food, and spent long stretches working inside the restaurant on occasion, and (4) he used the car for numerous non-work purposes, including commuting to school at either of two campuses, running errands, and traveling to social events.

This evidence is sufficient at least to create a genuine issue of fact on the question of whether plaintiff entered into the MSR Contract for personal purposes. Defendant objects to labeling plaintiff's work at China House II as "part-time" because it was his only job, but it does not follow that it was his primary occupation, and there is evidence to the contrary. A reasonable jury could find that plaintiff entered into the MSR Contract primarily for the personal purpose of having a car to drive in his daily life, of which delivering food for pay was only a small part,

particularly given that plaintiff lived with his parents and did not depend on his job at China House II for his livelihood. *See Shames-Yeakel*, 677 F. Supp. 2d at 1002-03 (finding genuine issue of fact on whether home equity line of credit had a personal or business purpose, where plaintiffs used the funds in part for vehicles that they used for both personal and business purposes and for roofing a building that contained a home office but was also their personal residence).

Defendant's motion for summary judgment is denied as to the TILA claim.

## II.    INTEREST ACT AND CILA

Defendant argues that it is entitled to summary judgment on the Interest Act/CILA claim because these statutes only apply to loans of money, not to financing of goods and services. *Dennis v. Old Republic Ins. Co.*, 578 N.E.2d 1010, 1015 (Ill. App. Ct. 1991) ("It is well settled that the Interest Act applies to those contracts which in substance involve a loan of money and is not applicable where there is a *bona fide* sale of goods or services."); *see also* 205 ILCS 670/1 (stating that CILA applies only to lenders "making loans of money" under certain conditions). In this case, defendant contends, defendant did not lend plaintiff money.  Rather, according to defendant, (1) plaintiff engaged Atomic to rebuild his transmission, (2) plaintiff made a payment of $340,00 to Atomic, (3)  defendant paid off plaintiff's balance by making payment directly to Atomic, and (4) defendant leased the transmission to plaintiff, with an option to buy at the end of the lease term. Defendant argues that this transaction was not a loan, for purposes of the Interest Act and CILA.

In a similar context, the Illinois Appellate Court has recently explained that Illinois courts recognize a critical distinction between (a) loans of money that a borrower uses to make a consumer purchase and (b) installment contracts for the sale of goods and services.  On the one hand, when a lending institution generally undertakes to pay merchants on behalf of a consumer in the expectation that the consumer will repay the lending institution, as in a typical credit card

16

arrangement, the lending institution's payment is, in substance, a loan to the consumer. *See Midland Funding LLC v. Schellenger*, 127 N.E.3d 1046, 1048 (Ill. App. Ct. 2019) (citing *Harris Trust and Sav. Bank v. McCray*, 316 N.E.2d 209, 212 (Ill. App. Ct. 1974)). On the other hand, an installment contract for the sale of particular goods and services, even if the contract is later assigned to a lending or financing institution, is *not* a loan. *See Midland Funding*, 127 N.E.3d at 1049-50 (citing *Citizen's Nat. Bank of Decatur v. Farmer,* 395 N.E.2d 1121, 1122 (Ill. App. Ct. 1979) and *Johnson v. Sears Roebuck & Co.*, 303 N.E.2d 627, 637 (Ill. App. Ct. 1973)). That is, where there is fundamentally no "tripartite relationship," *Midland Funding LLC*, 127 N.E.3d at 1048, but instead the seller permits a consumer to buy goods and services on credit and pay in installments over time, then there is no loan, even if a bank or similar institution later steps into the shoes of the seller as the assignee of the installment contract. *Id.* at 1049-50.

The credit arrangement in this case has aspects of both types of transactions, but in light of the purpose of the relevant statutes, the arrangement resembles the installment contracts in the latter category more than the credit cards in the former. Defendant cites *Williston on Contracts*, which recognizes that, while there is a loan if a "purchaser borrows a sum of money from a third person in order to buy goods from the seller," an installment contract is another matter, even if offered at a higher price than if the buyer paid the full price up front, and even if a financing institution participates in the transaction from the beginning:

> It is not a loan . . . if the same effect is achieved by means of a sale from the seller to the purchaser at [a] predetermined, higher "credit price," followed by the immediate assignment of the obligation from the seller to a third party (typically a bank or finance company) with the assigned obligation transferred at a substantial discount. In this . . . case, the purchaser cannot, according to the traditional view, plead usury. . . . ***The fact that the installment payment contracts are assigned to a finance company pursuant to a preexisting agreement with the dealer to take these assignments does not convert the original agreement between the purchaser and dealer into a usurious loan***. The courts look to the primary and basic purpose of the transaction.

9 Samuel Williston and Richard A. Lord, *Williston on Contracts* § 20:13 (4th ed. 1993). In the same section of the treatise, *Williston* cites *Boerner v. Colwell Co.*, 577 P.2d 200, 211 (Cal. 1978), which, as *Williston* explains, places "emphasis on the extent to which" the principle that installment contracts are not loans, even if administered by a bank or finance company, "lies at the foundation of consumer and commercial credit sales practices in this country," and upholds "against a usury challenge the sale of vacation homes and the assignment of the contracts to a financing company, even though the assignee was in effect in control of virtually all aspects of the transaction and played a part from the outset." *Williston*, § 20.13 n. 2. In *Boerner*, the California Supreme Court explained that "the instrument of the usury laws has no place in the field of bona fide credit sale financing, and . . . its use must be limited to those cases in which the record clearly reveals that the substantial intent of the parties was to effect the hire of money at an excessive rate of interest rather than to finance a bona fide sale of property." 577 P.2d at 211.

Based on these authorities, and in the absence of Illinois authority bearing directly on the question (the absence of pertinent Illinois authority in plaintiff's brief is conspicuous), the Court concludes that defendant financed "a bona fide sale of property" and services without making a loan of money, for purposes of the Illinois Interest Act and CILA.[1] It is not the classic case in which the seller offers an installment contract and then assigns it to a bank or other such institution, but it is closer to that case than to a general credit-card case or other such loan because the nature and purpose of the transaction was purely to finance a particular sale of goods and services. Defendant's motion for summary judgment is granted as to the Interest Act/CILA claims.

---

[1] The Court emphasizes that its conclusion in this regard is limited to the proper characterization of the MSR Contract transaction under the Illinois Interest Act and CILA; the parties have not briefed whether the transaction is a loan for purposes of any other statutes, and therefore the Court does not address the matter under any other statutes.

### III. ILLINOIS CONSUMER FRAUD ACT

Defendant argues that it is entitled to summary judgment on plaintiff's ICFA claim because there is no evidence that defendant's conduct, even if misleading or unfair, caused plaintiff any actual damages.

"The elements of a claim under the Illinois Consumer Fraud Act, 815 ILCS 505/2, are: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996) (internal citation altered). Additionally, to prevail on a claim under the ICFA, the plaintiff "must prove that he or she suffered 'actual damage as a result of a violation.'" *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 858-59 (Ill. 2005) (citing 815 ILCS 505/10a(a)).

Plaintiff claims (and supports his claim with deposition testimony) that he misunderstood the true cost of the credit defendant offered him and would not have entered into the MSR Contract if defendant had disclosed the APR, which, plaintiff claims, TILA required it to do. Plaintiff entered into the MSR Contract, incurring thousands of dollars in liability over and above the cost of the repair, made an initial in-store payment, and then made another payment to defendant before filing this suit. Plaintiff argues that he can show that defendant "concealed material facts in a transaction with plaintiff and that as a result plaintiff paid money he would not otherwise have paid," and incurred thousands of dollars in debt that he would not have incurred, which is sufficient to show causation of actual damages. (Pl.'s Resp. Br. at 14.)

The Court agrees with plaintiff that this is a viable damages theory. Illustrative of the point is *Jamison v. Summer Infant (USA), Inc.*, 778 F. Supp. 2d 900, 911 (N.D. Ill. 2011) (internal quotation marks omitted), in which the court explained that, under the ICFA, "the omission or

concealment of material facts can constitute the deceptive act or practice that causes actual damage to the plaintiff." In *Jamison*, the plaintiffs alleged that the defendants omitted to disclose the fact that the video monitors they sold were unencrypted and that they (the plaintiffs) would not have purchased them, at least not at the selling price, if they had known they were unencrypted. This was sufficient (if proved) to establish that the defendant's omissions caused the plaintiffs actual damages in the amount of the purchase price of the monitors. *Id.* at 911-12; *see Terrazzino v. Wal-Mart Stores, Inc.*, 335 F. Supp. 3d 1074, 1085 (N.D. Ill. 2018) (similar theory). Plaintiff has come forward with evidence to support actual damages under a similar theory, which is sufficient to survive defendant's motion for summary judgment.

In reply, defendant argues that *Jamison* is inapposite because it did not address the issue of whether the defendant lacked knowledge of the information it is meant to have disclosed. According to defendant, it did not calculate APR because it offered leases, not loans, so there was no interest and therefore no APR to disclose. The Court fails to see what this has to do with damages rather than liability, and to the extent this argument in plaintiff's reply brief exceeds the scope of the damages issue argued in the earlier briefs, the argument is forfeited. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."). Forfeiture aside, the argument is unpersuasive. Plaintiff's fundamental theory of this case is that his transaction with defendant was a loan disguised as a lease to circumvent TILA and conceal the true terms of credit, including the APR (*see* 3d Am. Compl. ¶¶ 18-21), and defendant does not seriously argue that there is no genuine dispute of material fact on this question.

Defendant's motion for summary judgment is denied as to the ICFA claim.

## <u>CONCLUSION</u>

For the reasons set forth above, defendant's motion for summary judgment [152] is granted in part and denied in part. The motion is granted as to the Illinois Interest Act and CILA claim in Count II. It is otherwise denied. The parties are directed to confer regarding settlement prospects and further case scheduling and file a joint status report by July 17, 2020.

**SO ORDERED.**

ENTERED: June 22, 2020

**HON. JORGE ALONSO**
**United States District Judge**